# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| SUSAN COLLISON | CIVIL ACTION NO. 07-CV-1175 |
| VS. | MAGISTRATE JUDGE METHVIN |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION | BY CONSENT OF THE PARTIES |

*MEMORANDUM RULING*

This matter is before the court on claimant's appeal from a decision of the Commissioner denying her social security disability benefits. Considering the administrative record, the briefs of the parties, and the applicable law, the administrative law judge's (ALJ's) decision of non-disability is **REVERSED** and **REMANDED** to the Commissioner.

*Background*

Collison filed her claim for disability benefits on August 23, 2005, alleging disability beginning June 1, 1998, due to hypertension, arthritis, osteoporosis, hepatitis-c, high cholesterol, chronic fatigue, back pains, anxiety, and depression disorder. Collison's last insured date was March 31, 2003. The ALJ found that between June 1, 1998, and March 31, 2003, Collison did not have any severe impairments, and was not under a disability at any time from June 1, 1998, through March 31, 2003, her date last insured. This appeal followed.

*Standard of Review and the Commissioner's Findings*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 136 (5th Cir. 2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232,

236 (5th Cir. 1994). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991). The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. Carey, 230 F.3d at 136; Johnson v. Bowen , 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. Johnson, 864 F.2d at 343.

In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f) (1992):

1. If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2. A person who does not have a "severe impairment" will not be found to be disabled.

3. A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4. If a person can still perform his past work, he is not disabled.

5. If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

In the case at bar, the ALJ found that through the date last insured, Collison had two medically determinable impairments: left medical epicondylitis and hypertension, but that these

impairments were not severe from the date of her alleged disability, June 1, 1998, to the last date of her insured status, March 31, 2003. Therefore, the ALJ terminated the disability analysis at the second step. However, the ALJ found that the evidence after the Collison's date last insured did support a finding of a severe impairment, as follows:

> The undersigned notes that the evidence after the claimant's date last insured expired substantiates a severe impairment. However, prior to the claimant's date last insured, there is no evidence to substantiate a severe impairment. The undersigned find the claimant's impairments are no more than slight abnormalities and did not impact her ability to perform work regardless of her age, education or work history. Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985).(Tr. 16)

In reaching her decision that Collison suffered from no severe impairment or combination of impairments prior to March 31, 2003, the ALJ commented on her review of the following medical records:

> The evidence of record reveals that the claimant has received treatment through the Veterans Administration. The claimant underwent an evaluation on July 5, 2000. She reported pelvic pain related to endometriosis. She denied being depressed but had situational anxiety due to moving into a new home. Her blood pressure was 174/98. She as concerned about osteoporosis. On December 13, 2001, she was evaluated for episodic elbow swelling. On examination, she had full range of motion of the left elbow. There was minimal tenderness with no erythemia. Elbow flexion test was negative for Tinel's sign and Phalen test on the left. On July 3, 2002, the claimant reported some muscle clonus of the left leg for about two months. On examination, there was full range of motion of the hip. On October 1, 2003, the claimant again report some clonus of the lower legs. On October 26, 2003, the claimant reported no history of falls. (Tr. 15).

In her Decision, the ALJ summarized the claimant's testimony as follows:

At hearing, the claimant reported that her back problems began in 1998. She had an unusual hurt not a normal back ache. Her right leg began twitching and her toes would bend under. She had lots of muscle cramps in her fingers. She started losing her muscle tone in her legs and she became fatigued. Her right leg began going out on her and she would "just fall without any warning." In addition, her blood pressure went up. (Tr. 15).

The ALJ found that while Collison's medically determinable impairments could have reasonable been expected to produce her alleged symptoms, she was not fully credible regarding the intensity of those symptoms, because she "missed appointments and did not take her medication as prescribed for her allegedly disabling impairments before her date last insured." (Tr. 15). The ALJ found that her hypertension was not well-controlled because of noncompliance, and referred to an October 3, 2003, progress note, which the ALJ stated reflected that the claimant had not had a wellness examination in over a year, and had missed all of her appointments recently. (Tr. 15). The ALJ also stated that "if claimant's impairments were as severe and disabling as alleged, she would have sought regular medical treatment." (Tr. 15).

The ALJ also noted that the state agency claims examiner opined that Collison did not have a severe impairment, and that no treating physician expressed an opinion regarding her ability to work, or recommended that she limit her work activity prior to March 31, 2003.

### *Assignment of Errors*

I. The ALJ's finding that the claimant did not have a severe impairment or combination of impairments prior to her date last insured, March 31, 2003, is not supported by substantial evidence.

### *Administrative Record*

**Medical History**

A review of the administrative record shows the following medical progress notes from the Veteran's Administration, excerpted as follows:[1]

---

[1] There are no medical records prior to 2000, although disability is alleged beginning June 1, 1998. A prior social security disability claim was denied at the initial level on August 25, 2000. (Tr. 61). Thus, there are no medical records in the file prior to July 5, 2000.

7/5/2000 - Depression screen - positive. Began taking Paxil. Reported pelvic pain. (Tr. 264).

8/4/2000 - complained of left hip and lower back and pelvic pain. A physical exam showed back points of tenderness on SI joint area and muscle tenderness around the same area. ROM ok, with minimal pain during exam. Diagnosis was muscle and joint inflammation. Robaxin and Naprosyn were prescribed. Medications were Zantac, Paxil, Slow K, Atenolol. (Tr. 261)

9/22/2000 - a test for stool blood was returned positive and a barium enema was scheduled. (Tr. 260).

9/25/2000 - appointment for occult blood stool follow up and barium enema. (Tr. 257).

11/9/2000 - follow up for barium enema on 10/00. The barium enema impression was scattered small diverticula sigmoid colon, otherwise normal exam. The examining physician's impression was high blood pressure, history of depression, GERD, mild elevation in TSH 5.1 (7/00), low back pain/spasm, and the plan was to continue her medications: Atenolol for blood pressure; paroxetine HCL (Paxil), Ranitidine HCL (Zantac), to begin Flexeril, and to schedule a colonoscopy. (Tr. 256).

2/15/2001 - a consult was scheduled for March 12, 2001, with Dr. Balthazar. (Tr. 254).

3/12/2001 - C-Scope was scheduled for April 27, 2001. At that appointment, it was noted that "PT UPSET AND CRYING, C/O BACK PAIN." (Tr. 253).

6/26/2001 - progress notes indicated that a straight leg test was mildly positive but not until leg elevated about 60 degrees on the left side, and that she complained of some LS tenderness. A lumbar spine x-ray was ordered. (Tr. 251).

10/3/2001 - an x-ray exam of the lumbosacral spine found the following:

LUMBAR SPINE: There are mild degenerative changes with anterior lipping of the body of the lumbar spine, especially at the level of L1/L2, L3/L4. There is bridging of the osteophyte at the level of T10 and T11. Calcification of descending portion of the aorta. Mild sclerosis of the facet joint at the level of L5/S1.
Impression: Mild degenerative changes. (Tr. 116).

11/02/2001 - the notes indicated that she had some arthritic pains of elbows, hands, knees, and low back pain, and that the LS spine x-ray showed degenerative joint disease. She had some back pain on elevating her left leg and some LS tenderness. The Flexeril, Lodine and Paxil were discontinued, and HCTZ, Elavil, Robaxin, Naprosyn, and Fioricet were prescribed. (Tr. 249- 250).

11/8/2001 - claimant reported that she was oversedated with Elavil. Elavil was discontinued and Restoril prescribed. (Tr. 248).

12/13/2001 - an orthopedic consult for her left elbow pain. Diagnosis was left medial epcondylitis. She received an injection and a left medial golfer's elbow strap. (Tr. 244).

3/21/2002 - she reported continued elbow pain, anxiety, and was tearful. Her elbow was reinjected, and she was prescribed Percocet and Paxil. (Tr. 241).

4/24/2002 - another C-scope was scheduled; she reported that she did not keep her last appointment due to an anxiety attack. She was prescribed a Decadron dosepack, her Paxil was increased to 40 mg daily, Percocet was refilled for pain, and Monopril was prescribed. (Tr. 236).

5/16/2002 - a preanesthetic report was issued, which showed the following active outpatient medications:

1)  APAP 325/BUTALBITAL 50/CAFF 40 MG TAB
2)  ATENOLOL 50 MG TABS
3)  CALCIUM CARB 1.5 GM/VITAMIN D 200 UNT TAB
4)  CLOTRIMAZOLE 1% 30 g CREAM
5)  DEXAMETHASONE .75 MG
6)  ENDOCET (PERCOCET GE) TAB
7)  ESTROGENS CONJUGATED 0.625 MG TAB
8)  FOSINOPRIL NA 10 MG TAB
9)  HYDROCHLOROTHIAZIDE 25 MG TAB
10) METHOCARBAMOL 500 MG TAB
11) NAPROXEN 500 MG EC TAB
12) PAROXETINE HCL 40 MG TAB
13) POTASSIUM CHLORIDE (K-DUR) 20 MEQ SA TAB
14) RANITIDINE HCL 150 MG TAB
15) TEMAZEPAM 15 MG CAP

(Tr. 233-234).

5/30/2002 - she had some small lesions removed from her scalp. (Tr. 229).

6/18/2002 - she reported an abscess in her ear and was prescribed antibiotics. (Tr. 229).

7/3/2002 - she complained of pain in her right hip and left shoulder. She also reported some muscle clonus[2] of her left leg for the past two months. The impression was borderline glucose intolerance; arthritis of shoulder and hip; leg clonus of undermined cause; and, hypertension better controlled. Her medications were kept the same, except that the Robaxin was increased and the Monopril was discontinued. An x ray of her right hip and left shoulder was ordered. An appointment was scheduled for Oct. 2002. (Tr. 227).

1/9/2003 - chart note to reschedule a well woman examination in six months. (Tr. 227).

The January 9, 2003, entry to reschedule the well woman examination is the last chart entry during the period of insured status. Eventually, Collison's reports of leg clonus and hyperflexia,[3] in October, 2003 (Tr. 213, 214), March, 2004 (Tr. 196, 197), led her VA physicians to order an MRI, which was done in June, 2004 (Tr. 184). The MRI report found the following:

1) An element of spinal lipomatosis[4] is present at the L3, 4 and 5 levels.

2) There is also limited facet joint hypertrophy at L4-5 and L5-S. The facet joint hypertrophy does not appear to significantly narrow the spinal canal and most of the narrowing of the dural sac is due to the fatty elements. (Tr. 184).

The Alexandria VA doctor referred Collison to the VA in Shreveport, Louisiana, for a neurosurgical evaluation, but apparently her records failed to arrive in time for the consultation, and she was not clinically evaluated. On March 1, 2005, she was sent to physical therapy, where she was given a rolling walker, a long handle shoe horn, a tub transfer bench, 2 grab bars, a non-slip bath mat, a hand held shower hose, and a tens unit for pain. (Tr. 140, 142). A March 16,

---

[2] A form of movement marked by contractions and relaxations of a muscle, occurring in rapid succession seen with, among other conditions, spasticity and some seizure disorders. *Stedmans Medical Dictionary* 364 (27th ed. 2000).

[3] Hyperflexion is defined as "flexion of a limb or part beyond the normal limit." *Stedmans Medical Dictionary* 849 (27th ed. 2000).

[4] "With this condition, there is hypertrophy of the epidural adipose tissue, causing a narrowing of the spinal canal and compressions of neural structures. A majority of patients will present with progressive myelopathy, but radicular symptoms are also common." Daniel R. Fassett, M.D., M.B.A.; Meic H. Schmidt, M.D., "Spinal Epidural Lipomatosis: A Review of Its Causes and Recommendations for Treatment," *Neurosurgical Focus,* Vol. 16, Number 4 (2004) accessed September 29, 2008, http://www.medscape.com/viewarticle/474908.

2005, note by neurosurgery team stated that "history and MRI films have been reviewed" and that no significant neurosurgical defects, and no neurosurgical interventions were indicated at this time.

On May 17, 2006, the Lafayette VA physician wrote the following in another request for a neurosurgical consult:

> Review of the record indicates that this patient's primary problem is not of orthopedic nature. An excellent note by a Nurse Practitioner 3/1/05 further supports the above point. Clinical sx with gait disturbance strongly suggest intra-spinal tumor with upper motor neuron involvement. MRI may not have show herniated disc but neurosurgery has to evaluate again with a fresh look to r/o epidural lipomatosis as suggested on MRIs. Obviously this issue has not been addressed. The record fails to reveal that the neurosurgery evaluated this patient CLINICALLY. After all neurosurgery deals with other entities besides a simple herniated disc!!. Following the epidural lipomatosis is r/o as a culprit by neurosurgery, then neurology should be consulted further. (Tr. 372, 373).

The undersigned can find no neurosurgical evaluation after May 17, 2006, in the record.

### *Analysis*

*Medically Determinable Impairments*

A "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C.A. § 423(d)(3). In this matter, the ALJ found that Collison had only two medically determinable impairments through her last insured date: left medial epicondylitis and hypertension, and further found that neither of these two impairments were severe. Therefore, the ALJ ended his analysis at the second step. However, Collison's medical records show that she was diagnosed and treated for degenerative joint disease and depression throughout her insured period, June 1, 1998, to March 31, 2003.

Therefore, the ALJ's finding that Collison's only impairments were left medial epicondylitis and hypertension is not supported by substantial evidence of record.

The claimant's medical records indicate that she was diagnosed by x-ray with degenerative joint disease of her spine as far back as October 3, 2001, and she suffered pelvic, back, and hip pain virtually from the beginning of her available medical records, July 5, 2000, through the date of the hearing. As outlined above, she was treated for years for low back pain, and she was prescribed multiple pain killers and anti-inflammatory medications. The ALJ's failure to find degenerative joint disease as a medically determinable impairment was error, as the diagnosis and treatment is found throughout the medical records during the dates of her insured status.

Likewise, the claimant's medical records reflect diagnosis and treatment for depression as far back as July 5, 2000, through the termination of her insured status on March 31, 2003. On July 5, 2000, a depression screen was positive, and she was prescribed antidepressants throughout her available relevant medical history. Therefore, it was error for the ALJ to ignore the claimant's depression as an impairment in the disability analysis.

*Credibility of Claimant*

The ALJ did not find that Collison suffered from any severe impairments. However, as discussed above, the only two impairments that the ALJ recognized and analyzed at all were left medial epicondylitis and hypertension. The ALJ found that while these impairments "could have been reasonably expected to produce the alleged symptoms" Collison's "statements concerning the intensity, persistence and limiting effects of these symptoms" were not entirely credible. (Tr. 15). The ALJ stated that she missed appointments, and did not take her medication as prescribed.

Specifically, the ALJ referred to a progress note dated October 3, 2003, which indicated that she had not had a wellness examination in over a year, and had missed all recent appointments.[5] The ALJ further stated that "[i]t is reasonable to believe that if the claimant's impairments were as severe and disabling as alleged, she would have sought regular medical treatment." (Tr. 15).

The medical records available during Collison's period of alleged disability and insured status show regular and frequent medical care. There are medical progress notes for July 5, 2000 (Tr.262 - 266), August 4, 2000 (Tr. 261, 262), September 22, 2000 (Tr. 260-261), September 25, 2000 (Tr. 257 - 260), November 9, 2000 (Tr. 255 - 257), February 15, 2001 (Tr. 254-255), March 12, 2001 (Tr. 253 - 254), April 27, 2001 (Tr. 253), June 26, 2001 (Tr. 251 - 252), June 27, 2001 (Tr. 251), July 20, 2001 (Tr. 251), November 2, 2001 (Tr. 248 - 251), November 8, 2001 (Tr. 248), December 13, 2001 (Tr. 244 - 248), March 21, 2002 (Tr. 241 - 244), April 24, 2002 (Tr. 236 - 240), May 16, 2002 (Tr. 232 - 235), May 28, 2002 (Tr. 230 - 231), May 30, 2002 (Tr. 229 - 230), July 3, 2002 (Tr. 227 - 229).

Collison's insured status ended on March 31, 2003. The record shows that during the relevant time period, it is simply factually inaccurate that Collison failed to seek regular medical treatment. Furthermore, there is no indication that she failed to take her medications as prescribed, except for two entries where it is noted that she stopped taking Elavil because it made her too sleepy (Tr. 248), and stopped taking Monopril because it made her dizzy and her blood pressure too low (Tr. 228). Therefore, the ALJ's finding that the claimant's complaints of pain and limitations were not credible because of her lack of regular medical treatment is not supported by substantial

---

[5]The correct date of the note is August 26, 2003 (Tr. 219).

evidence. A credibility choice that is based on an erroneous interpretation of medical records requires reversal and remand. Olson v. Schweiker, 663 F.2d 593, 596 (5th Cir. 1981).

*Severity*

The medical records and testimony of the claimant support a finding that the claimant's degenerative joint disease was more than a slight abnormality that did not impact her ability to perform work regardless of her age, education, or work history. Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985). On remand, the ALJ should determine whether her depression, and her other medically determinable impairments, are also severe impairments under the Stone standard.[6] On remand, the ALJ should also consider the combined effects of all of Collison's impairments, severe or otherwise, in the disability analysis. See Loza v. Apfel, 219 F.3d 378, 393, 394 & 399 (5th Cir. 2000).

## *Conclusion*

The ALJ's decision that the claimant suffered from no severe impairment is not supported by the evidence of record. The claimant suffered from the medically determinable impairments of degenerative joint disease and depression, in addition to the impairments found by the ALJ, and the record supports a finding that at least the degenerative joint disease was a severe impairment. Any judgment entered herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA). See, Richard v. Sullivan, 955 F.2d 354 (5th Cir. 1992) and Shalala v. Schaefer, 509 U.S. 292 (1993). For the reasons given above,

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** that the Commissioner's decision is **REVERSED** and **REMANDED** to the Commissioner for further

---

[6] While the ALJ did recite the Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985), standard in her decision, is it unclear whether this standard was actually utilized, as an improper standard is also used throughout the decision.

administrative action pursuant to the fourth sentence of 42 U.S.C. § 405(g). On remand, the ALJ shall evaluate the claimant's medically determinable impairments of depression, left medial epicondylitis, and hypertension under the correct severity standard, and due to the presence of the severe impairment of at least degenerative joint disease, shall continue the disability analysis beyond the second step. In that analysis, the combined effects of all of the claimant's impairments, severe or otherwise, shall be considered.

Signed at Lafayette, Louisiana, on September 29, 2008.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)